R. David Hosp
ORRICK, HERRINGTON & SUTCLIFFE, LLP
222 Berkeley St. Ste 2000
Boston, MA  02116
Telephone: (617) 880-1886
Facsimile: (617) 880-1801
Email: dhosp@orrick.com

René A. Kathawala
Paige Pavone
Lauren D. Allen
ORRICK, HERRINGTON & SUTCLIFFE, LLP
51 West 52nd Street
New York, NY  10019
Telephone: (212) 506-3604
Facsimile: (212) 506-5151
Email: ppavone@orrick.com

Katherine Melloy Goettel (*Pro Hac Vice* Admission Pending)
AMERICAN IMMIGRATION COUNCIL
1331 G Street, NW, Suite 200
Washington, DC 20005
Tel.:  (202) 507-7552
Email: kgoettel@immcouncil.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| FRANKLIN GOMEZ CARRANZA and RUBEN TORRES JAUREGUI, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., <br><br> Defendants. | Case No. 20-CV-00424 (KG) (KRS) <br><br> **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................ 2

    A.   ICE Acknowledges COVID-19's Substantial Impact and the Resulting Need to Expand Telephone Access But Does Not Comply with Its Own Policies at Otero. .................................................................................. 2

    B.   Despite ICE Policy Promoting Expanded Telephone Access, Restrictive Practices at Otero Have Rendered All Communications With the Outside World Nearly Impossible. ................................................................... 3

        1.   Defendants Refuse to Implement Procedures for Scheduling Legal Calls at Otero. .................................................................................. 3

        2.   Defendants Refuse to Schedule Legal Intake Calls between Non-Profit Legal Service Providers and Individuals Detained at Otero. ........... 5

        3.   Defendants Create Impossible Procedural Hurdles, Including Mandating Signed G-28 Forms, for Scheduling Legal Calls. .................... 7

        4.   When Defendants Refuse to Facilitate Legal Calls, Calls Are Prohibitively Expensive or of Insufficient Length. .................................. 8

        5.   When Defendants Fail to Facilitate Legal Calls, Calls Are Monitored and Lack Privacy. .......................................................... 10

        6.   Defendants Fail to Provide Reliable, Quality Phone and Tablet Service at Otero. ....................................................................... 12

III.  LEGAL STANDARD ................................................................................ 12

IV.   ARGUMENT ............................................................................................. 13

    A.   Plaintiffs have a Substantial Likelihood of Succeeding on the Merits of their Claims. ......................................................................................... 13

        1.   Plaintiffs have a Substantial Likelihood of Succeeding on their Fifth Amendment Due Process and Access to Counsel Statutory Claims. .................................................................................... 13

            a.   Defendants' Restrictive Telephone Access Practices Have Violated Plaintiffs' Fifth Amendment Rights. ........................... 13

            b.   Defendants' Restrictive Telephone Access Practices Have Violated Plaintiffs' Statutory Rights. ....................................... 15

            c.   Case Law Makes Clear that Plaintiffs have a Substantial Likelihood of Success on the Merits. ....................................... 15

        2.   Plaintiffs have a Substantial Likelihood of Succeeding on their First Amendment Claims. ......................................................... 18

    B.   Defendants' Failure to Provide for Telephone Access Irreparably Harms Plaintiffs and Putative Class Members. ............................................... 19

    C.   The preliminary injunction would cause no injury to Defendants and would be in the public interest ................................................................ 24

V.    CONCLUSION .......................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*A.O. Smith Corp. v. FTC,*
    530 F.2d 515 (3d Cir.1976)...........................................................................................19

*Ardestani v. INS,*
    502 U.S. 129 (1991) ....................................................................................................14

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) ..................................................................................25

*Daniels v. Morris Cnty. Corr. Facility,*
    No. CIV.A. 06-2460(DMC), 2006 WL 2524177 (D.N.J. Aug. 30, 2006)...........................18

*Diallo v. Gonzales,*
    447 F.3d 1274 (10th Cir. 2006) ..................................................................................14

*Dine Citizens Against Ruining Our Env't v. Jewell,*
    839 F.3d 1276 (10th Cir. 2016) ..................................................................................12

*Doe v. McAleenan,*
    415 F. Supp. 3d 971 (S.D. Cal. 2019)........................................................................25

*Eight N. Indian Pueblos Council, Inc. v. Kempthorne,*
    No. CV 06-745 WJ/ACT, 2006 WL 8443876 (D.N.M. Sept. 15, 2006)............................25

*Fraihat v. ICE litigation,*
    2020 WL 1932570 (C.D. Cal. Apr. 20, 2020) ......................................................23

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado,*
    916 F.3d 792 (10th Cir. 2019) .............................................................................24, 25

*Fund for Animals v. Clark,*
    27 F. Supp. 2d 8 (D.D.C.1998)...................................................................................25

*Gutierrez-Soto v. Sessions,*
    317 F. Supp. 3d 917 (W.D. Tex. 2018).......................................................................18

*Hennigh v. City of Shawnee,*
    155 F.3d 1249 (10th Cir. 1998) ..................................................................................14

*Innovation Law Lab v. Nielsen,*
    310 F. Supp. 3d 1150 (D. Or. 2018) ..............................................................17, 20, 22

*Jackson v. King,*
    No. 2:12-CV-00421-MCA-RHS, 2013 WL 12334146 (D.N.M. Mar. 30, 2013).................24

*Johnson ex rel. Johnson v. Brelje*,
   701 F.2d 1201 (7th Cir. 1983) ............................................................. 17, 18

*Johnson v. Galli*,
   596 F. Supp. 135 (D. Nev. 1984) .............................................................. 19

*Kikumura v. Hurley*,
   242 F.3d 950 (10th Cir. 2001) .................................................................. 19

*Legal Servs. Corp. v. Velazquez*,
   531 U.S. 533 (2001) ................................................................................... 18

*Logan v. Pub. Emps. Ret. Ass'n*,
   163 F. Supp. 3d 1007 (D.N.M. 2016) ....................................................... 13

*Lyon v. ICE*,
   No. 13-cv-05878-EMC (N.D. Cal. Oct. 31, 2016) .................................... 25

*McClendon v. City of Albuquerque*,
   272 F. Supp. 2d 1250 (D.N.M. 2003) ................................................... 19, 20

*Medina v. DHS*,
   313 F. Supp. 3d 1237 (W.D. Wash. 2018) ................................................ 25

*Moore v. Janing*,
   427 F. Supp. 567 (D. Neb. 1976) .............................................................. 18

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................... 24

*Orantes-Hernandez v. Meese*,
   685 F. Supp. 1488 (C.D. Cal. 1988) ......................................................... 17

*Osborn v. Shillinger*,
   932 F.2d 975 (10th Cir. 1991) .................................................................. 14

*Planned Parenthood Ass'n of Utah v. Herbert*,
   828 F.3d 1245 (10th Cir. 2016) ................................................................ 12

*Prairie Band of Potawatomi Indians v. Pierce*,
   253 F.3d 1234 (10th Cir. 2001) ................................................................ 19

*Procunier v. Martinez*,
   416 U.S. 396 (1974) ................................................................................... 14

*Ramirez v. ICE*,
   310 F. Supp. 3d 7 (D.D.C. 2018) .............................................................. 21

*Reno v. Flores*,
   507 U.S. 292 (1993) .......................................................................................... 14

*Rodriguez-Castillo v. Nielsen*,
   No. 5:18-CV-01317-ODW-MAA, 2018 WL 6131172 (C.D. Cal. June 21,
   2018) ................................................................................................................... 17

*S. Poverty Law Ctr. v. DHS*,
   No. CV 18-760 (CKK), 2020 WL 3265533 (D.D.C. June 17, 2020) ........................... *passim*

*Strandberg v. City of Helena*,
   791 F.2d 744 (9th Cir. 1986) ............................................................................. 18

*Torres v. DHS*,
   411 F. Supp. 3d 1036 (C.D. Cal.) ................................................................. 16, 18

*Torres v. DHS*,
   Case No. 18-2604, 2020 WL 3124216 (C.D. Cal. April 11, 2020) .............................. *passim*

*United States v. Aguirre-Tello*,
   353 F.3d 1199 (10th Cir. 2004) ......................................................................... 14

*United States v. Cias*,
   No. CR 10-0420 JP, 2010 WL 11530513 (D.N.M. July 29, 2010) ...................... 14

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) .......................................................................................... 18

*Upshaw v. Alameda Cnty.*,
   377 F. Supp. 3d 1027 (N.D. Cal. 2019) ............................................................. 25

*Woods v. Bd. of Cnty. Comm'rs*,
   No. 1:20-cv-00529-PJK-LF, 2020 U.S. Dist. LEXIS 126526 (D.N.M. July 17,
   2020) ................................................................................................................... 13

**Statutes**

5 U.S.C. § 555(b) ................................................................................................ 15

8 U.S.C. § 1226(a) .............................................................................................. 15

8 U.S.C. § 1229a ................................................................................................. 15

8 U.S.C. § 1362 ................................................................................................... 15

**Other Authorities**

8 C.F.R. § 1003.16(b) ......................................................................................... 15

8 C.F.R. § 1292.5(b) ................................................................................................... 15

Performance-Based National Detention Standards 2011 (Dec. 2016) .................................. 24, 25

## I.  INTRODUCTION

The coronavirus pandemic has all but halted in-person legal visitation for detained non-citizens.  Despite this, Immigration and Customs Enforcement ("ICE") is not providing individuals detained at the Otero County Detention Processing Center ("Otero") with access to counsel through the only safe means currently available:  a reliable procedure to schedule free, private, and confidential legal calls.  While ICE publicly recognizes the heightened need "to facilitate communication with families and attorneys through extended access to telephones" during the COVID-19 pandemic, *see* ICE Guidance on COVID-19, https://www.ice.gov/coronavirus (last visited August 21, 2020), Plaintiffs at Otero suffer from the substantial impact of Defendants' curtailment of in-person visitation without meaningful telephone access.  Immediate court intervention is required to protect Plaintiffs from the ongoing, irreparable harm that results.

Telephone access conditions in Otero have deteriorated even further since the filing of the complaint in early May.  Defendants refuse to facilitate free, confidential, and private calls with legal service providers; effectively prohibit legal intake calls; frequently disconnect calls after 5 to 10 minutes; and force Plaintiffs to make legal calls on recorded lines.  In the rare circumstances where a legal service provider has been able to schedule a legal call through ICE, the process has been unreliable and time-consuming.  These practices are unacceptable no matter the state of the world.  In a global pandemic when ICE has issued policies limiting all in-person visitation, highly restrictive telephone access violates Plaintiffs' fundamental rights.

Telephones are an efficient and crucial means through which detained individuals communicate with counsel and family.  Providing telephone access that is free, unmonitored, private, subject to consistent and reliable scheduling, and of meaningful duration takes little effort from Defendants.  At the same time, meaningful telephone access ensures that Defendants

are in compliance with their legal obligations to provide detained individuals with due process, including access to counsel, and the right to petition the government.  In fact, Defendants have already sketched out much of the relief that Plaintiffs request in their Performance-Based National Detention Standards.  On a policy level, ICE acknowledges the exceptionally critical value of telephonic and other remote communication methods during a global pandemic, but in practice, ICE field officers responsible for Otero fail to make telephones accessible.  Instead, for days and weeks, Plaintiffs and their counsel endure ignored and often dead-end communications with ICE to set up calls, only to have eventual legal calls drop, be too noisy, or not occur at scheduled times.  There is no justification, logic, or legitimate public interest in Defendants' telephone access practices at Otero and we respectfully ask this Court to certify a class,[1] and to issue injunctive relief to ensure, protect, and restore Plaintiffs' rights.

## II.     STATEMENT OF FACTS

### A.     ICE Acknowledges COVID-19's Substantial Impact and the Resulting Need to Expand Telephone Access But Does Not Comply with Its Own Policies at Otero.

The health impact of COVID-19 is even more pronounced in ICE detention facilities than outside of those facilities, with 150 confirmed cases to-date amongst the approximately 800 detained individuals at Otero.  *See* ICE Guidance on COVID-19.  Accordingly, ICE has taken many precautionary measures to curtail in-person visitation, which necessitates alternative access to maintain Plaintiffs' constitutional and statutory rights.  In April 2020, ICE suspended social visitation in all detention facilities.  *Id.*  In-person legal visitation is permitted with restrictions. "Non-contact legal visitation (*e.g.*, Skype or teleconference) should be offered first to limit

---

[1] The parties have fully briefed class certification and incorporate those arguments herein. *See* Mot. for Class Certification, ECF No. 4; Reply in Support of Mot. for Class Certification, ECF No. 28.

exposure to ICE detainees." *Id.* This has not been made available at Otero. Legal visitors must undergo health screenings and wear personal protective equipment. *Id.* Justifiably, many non-profit legal service providers and law firms, including those with attorneys working *pro bono,* have instructed employees not to travel or conduct in-person work.

ICE has acknowledged the "substantial impact" of curtailed in-person visitation and has recognized that expanded telephone access and remote visitation is the appropriate response. *Id.* ICE recommends that detention facilities "[c]onsider allowing increased telephone privileges **without a cost barrier** to maintain mental health and connection with others while isolated." ICE ERO, U.S. ICE Enforcement and Removal Operations COVID-19 Pandemic Response Requirements Version 3.0, July 28, 2020 ("ICE Pandemic Response"), p. 23, https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (emphasis added). ICE policy calls for implementing much of the relief Plaintiffs seek, including: "virtual visitation"; "[a]dding all immigration attorneys of record to the Talton[2] Pro-bono [free and unmonitored] platform"; "a process for detainees/attorneys to schedule appointments and facilitate the calls"; and "[l]everaging technology (e.g., tablets, smartphones) to facilitate attorney/client communication." *See id.* at p. 19.

> **B.    Despite ICE Policy Promoting Expanded Telephone Access, Restrictive Practices at Otero Have Rendered All Communications With the Outside World Nearly Impossible.**
>
> > **1.    Defendants Refuse to Implement Procedures for Scheduling Legal Calls at Otero.**

Despite the increased reliance on telephone communications during the coronavirus pandemic, and despite repeated efforts by multiple attorneys and legal service organizations to establish a working procedure, ICE has not set up any procedure for facilitating free, confidential

---

[2] Talton is the phone service provider at Otero.

legal calls at Otero.  *See* Decl. of Estrella Cedillo, dated August 20, 2020 ("Cedillo Decl.") at ¶ 6; Decl. of María Martínez Sánchez, dated Aug. 18, 2020 ("Sánchez Decl.") at ¶¶ 5-10; Decl. of Max Brooks ("Brooks Decl."), dated August 7, 2020, at ¶ 5.; Decl. of Imelda Maynard, dated August 17, 2020 ("Maynard Decl.") at ¶ 3.  Attorneys have reported that "ICE does not reliably or promptly respond to [their] requests to arrange telephone calls to [their] clients.  As a result, despite emails and phone calls to ICE officers, ICE does not reliably convey messages to . . . clients or arrange for phone calls at the time requested."  Brooks Decl. at ¶ 3a.  In fact, on several occasions, ICE officials have refused to set up any legal calls for detained individuals and have affirmatively told attorneys that they would "no longer set up calls with detainees."  Sánchez Decl. at ¶ 10 (referencing an April email from the ICE Assistant Field Office Director stating that ICE would end making calls and explaining "[t]his is for all calls not just intake"); Cedillo Decl. at ¶ 9 (explaining that in May, the ICE Deputy Field Office Director said he would not require ICE officers to set up free, confidential legal intake calls at Otero).

If ICE does schedule a call, which happens, infrequently, on an *ad hoc* basis, it often takes days of repeated requests, and ICE often does not ensure that scheduled calls actually take place.  Brooks Decl. at ¶ 9 (noting that seven scheduled calls through ICE were not honored between June 3, 2020, and July 31, 2020 between one legal representative and her client); Decl. of Elsa Goossen, dated Aug. 19, 2020 ("Goossen Decl."), at ¶¶ 6-10 (explaining that "it took eight business days to schedule [] one phone call," including nine emails and multiple calls to the facility); *see id.* at ¶¶ 11-15, 17-18 (reporting that an attorney was only able to schedule an urgent call with the intervention of an Assistant United States Attorney); Cedillo Decl. at ¶ 15 (explaining that a volunteer with Santa Fe Dreamers had to make four email separate requests in order to arrange one call with a potential client, and when he finally made the call, it was a paid,

non-confidential call); *see id.* at ¶ 17 (reporting that again it took four requests to schedule one call that was on a paid, recorded line).

As a result of the absence of any procedure, attorneys have been unable to have free, confidential legal calls with their clients.  For example, in order to maintain in contact with his clients and prospective clients, one attorney "had to create a work-around," where he asked detained individuals to call him every day, but they "had to make these calls using their own funds and the calls were on a recorded line."  Decl. of Joachim Marjon, dated August 16, 2020 ("Marjon Decl."), at ¶ 4.  *See also*  Decl. of Heidi Cerneka ("Cerneka Decl."), dated August 17, 2020 at ¶ 5 (explaining that ICE "never arranged for a free, confidential legal call" with a client seeking asylum, so instead those calls were on a recorded line and required the family to deposit funds into his account).

> ### 2.      Defendants Refuse to Schedule Legal Intake Calls between Non-Profit Legal Service Providers and Individuals Detained at Otero.

A thorough legal intake is necessary before a legal service provider can represent a detained individual.  Supplemental Decl. of David Jackson ("Jackson Decl."), dated August 17, 2020, at ¶ 4.  Without sufficient information about a potential client and his or her legal claims, and without permission from the client to enter an attorney-client relationship, an attorney cannot commit to representation.  *See* Cedillo Decl. at ¶ 10.  Legal intake programs are critical for Plaintiffs and putative class members in expedited removal proceedings, full removal proceedings, bond hearings, habeas petitions, parole requests, civil litigation, and affirmative applications for immigration benefits.  *See* Jackson Decl. at ¶ 2; Marjon Decl. at ¶ 6; Cedillo Decl. at ¶ 2.  Due to the COVID-19 pandemic, legal service providers that work with individuals detained in Otero, including the Las Americas Immigrant Advocacy Center ("Las Americas") and Santa Fe Dreamers Project ("Santa Fe Dreamers"), have stopped conducting in-person legal

intakes and have attempted to transition to telephonic legal intakes.  Jackson Decl. at ¶ 5; Cedillo Decl. at ¶ 3.

There is no formal procedure for scheduling legal intake calls at Otero.  Jackson Decl. at ¶ 5; Cedillo Decl. at ¶ 7.  From March 19, 2020, to May 13, 2020, David Jackson, the Supervising Intake Specialist at Las Americas, arranged an informal system through which he would contact ICE Supervisory Detention and Deportation Officer Roberto Sanchez to schedule legal intake calls with potential clients.  Jackson Decl. at ¶ 5.  *See also* Decl. of David Jackson, dated May 13, 2020, Dkt. Entry No. 8.  However, that arrangement proved to be unreliable:  20 to 25 of the arranged calls were not honored and, when they were honored, the calls were several hours late, which defeated the purpose of scheduling.  *Id.* at ¶¶ 3-4.  ICE stopped responding to Las Americas' legal intake scheduling requests in May.  Since then, Las Americas has been unable to schedule legal intake calls through ICE.  Jackson Decl. at ¶ 6.

As a workaround, Las Americas has directly funded legal intake calls for potential clients, when available, incurring $10 to $15 per call.  Jackson Decl. at ¶ 7.  They do so by putting money into potential clients' commissary accounts solely to conduct a legal intake to determine whether to take on the individual as a client.  *Id.*  Because ICE does not arrange these calls, detained individuals must place these paid calls from the phones in the housing units, which are recorded and thus are not confidential or private.  *Id.* at ¶ 8.  Las Americas serves eight immigration detention facilities in addition to Otero.  Otero is the only center where ICE refuses to arrange free legal intake calls.  *Id.* at ¶ 11.

The Santa Fe Dreamers Project has also been unable to schedule legal intake calls at Otero through ICE.  Cedillo Decl. at ¶ 5 ("[W]e have had the most difficulty reaching individuals for legal intakes.").  In fact, the ICE Deputy Field Office Director told Santa Fe Dreamers Project attorney Estrella Cedillo that "he would not force his ICE officers to set up free,

confidential legal intake calls." *Id.* ¶ 9.  As a result, though Attorney Cedillo regularly attempts

to arrange legal intake calls by contacting ICE supervisory officers, this procedure "never results

in a free, confidential call." *Id.* ¶ 6.

### 3.  Defendants Create Impossible Procedural Hurdles, Including Mandating Signed G-28 Forms, for Scheduling Legal Calls.

As an additional obstructive measure, Defendants have demanded that legal

representatives produce a signed G-28 form before permitting legal calls or legal intake calls

with individuals detained at Otero.  *See* Brooks Decl. at ¶¶ 3e, 5; Goossen Decl. at ¶¶ 11-12.  A

G-28 is a U.S. Citizenship and Immigration Services (USCIS) form that serves as a legal

representative's notice of an attorney-client relationship with a detained individual for

immigration matters before DHS.[3]  *See* USCIS, *G-28, Notice of Entry of Appearance as Attorney

or Accredited Representative*, https://www.uscis.gov/g-28 (last accessed Aug. 21, 2020).

Defendants have required that legal representatives produce a signed G-28—verifying the

attorney-client relationship—*before* they will agree to arrange a legal *intake* call.  *See* Brooks

Decl. at ¶ 3e, 5, 7; Cedillo Decl. at ¶ 10.  A legal representative cannot ethically enter an

appearance on behalf of a client who has not retained her and before they have ever even spoken.

*See* Cedillo Decl. at ¶ 10 ("It is not possible for [counsel at the Santa Fe Dreamers Project] to

enter into a representation agreement with an individual that we have not met with before, and

therefore, it is not possible for us to provide a signed G-28 for a person we have not met.").  *Id.*

Thus, Defendants' refusal to schedule legal intake calls without signed G-28 forms is a catch-22

that prevents the scheduling of many if not all legal intake calls at Otero.  *Id.*

---

[3] Attorneys not seeking to represent clients in matters related to immigration, including civil rights and federal habeas litigation, do not sign G-28s with their clients, yet ICE still requests that they do so before scheduling legal calls.  Goossen Decl. at ¶¶ 11-12.  ("ACLU attorneys do not practice immigration law; therefore, G-28s are not applicable to our ability to access legal calls with detainees.").

Despite the impracticability of in-person visitation during COVID-19, and ICE policy limiting the practice, Defendants have required that a G-28 form be submitted with wet signatures by both the legal representative and the client before permitting the scheduling of legal calls. *See* Brooks Decl. at ¶ 7. Because legal service providers must now necessarily mail a G-28 to their clients and then wait for the client to mail the signed form back, it is often not possible to obtain a wet signature before an urgent legal call is necessary. Brooks Decl. at ¶ 3e. Significantly, even when counsel provides ICE with a signed G-28 form, ICE refuses to schedule legal calls. Cedillo Decl. at ¶ 10 ("[E]ven when we have an original, signed G-28, ICE has not arranged for free legal calls.").

### 4. When Defendants Refuse to Facilitate Legal Calls, Calls Are Prohibitively Expensive or of Insufficient Length.

If ICE does not facilitate a legal call, people detained at Otero currently have two means of reaching the outside world: calls made over housing unit telephones and calls using a program called Getting Out on tablets. *See* Decl. of Margaret Brown Vega, dated August 19, 2020 ("Vega Decl."), at ¶ 3; Sánchez Decl. at 7. Both the housing unit phones and the tablets require payment, except for free ten-minute calls discussed below. Vega Decl. at ¶ 3. While certain legal service providers approved by the Executive Office for Immigration Review ("EOIR") may have one telephone number that detained individuals may call for free through the Otero phone system, this system does not provide for free calls where the provider's staff and volunteers have separate phone lines.[4] *See* Jackson Decl. at ¶ 5. Therefore, if they cannot access the no-cost, ten-minute calls, detained individuals can only place calls if they have funds in their commissary accounts. Cerneka Decl. at ¶ 3; Marjon Decl. at ¶ 4; Brooks Decl. at ¶ 3c.

---

[4] Attorneys have reported that even calls to numbers on the EOIR list suffer from defects. *See* Maynard Decl. at ¶ 3a (noting that legal intake calls made through the EOIR list automatically cut off after five minutes).

The cost of calls is "sometimes prohibitive."  Cerneka Decl. at ¶ 3.  Talton charges approximately twenty cents a minute while legal calls can last hours.  Cedillo Decl. at ¶ 11.  As a result, attorneys report that they must keep legal calls short because of clients' limited funds.  Marjon Decl. at ¶ 9 ("I had to work as quickly as possible, because our clients were [] paying for the calls.").  When funds run out, calls abruptly disconnect before attorneys and clients can complete necessary conversations.  Brooks Decl. at ¶ 8a (reporting that a paid phone call "cut off before [an] intake could be completed").  In one instance, a volunteer with Santa Fe Dreamers Project attempted to conduct an intake with a potential client, but the potential clients' funds ran out before the volunteer could complete the intake.  Cedillo Decl. at ¶ 14.  As a result, Santa Fe Dreamers Project could not represent him and he was removed.  *Id.*  The cost has become such a barrier to legal intake calls at Las Americas that the legal service provider has been forced to spend at least $400 on phone calls—an unsustainable expense.  Jackson Decl. at ¶ 9.

In response to the coronavirus pandemic, since April, ICE has stated that it provides detained individuals in Otero with a finite number of free ten-minute calls each month.[5]  Cerneka Decl. at ¶ 3; Brooks Decl. at ¶ 3c; Vega Decl. at ¶ 26.  However, a ten-minute call is inadequate for most legal calls.  *See* Cerneka Decl. at ¶ 3 ("[A] ten-minute call is generally inadequate to accomplish what needs to be accomplished on a legal call, such as drafting declarations, discussing an upcoming hearing, or preparing testimony.").  If Plaintiffs use back-to-back ten-

---

[5] While ICE represents that it is providing 500-520 free call minutes a month to detained individuals during the pandemic, *see* ICE Guidance on COVID-19, this does not appear to be the case at Otero. Detained individuals in Otero have reported receiving between zero and nine free ten-minute calls a week. *See* Vega Decl. at ¶¶ 27-28.  For individuals placed in solitary confinement after testing positive for COVID-19, the free ten-minute calls are unavailable altogether.  *Id.* at ¶ 32.  Moreover, "ICE has not given detained individuals clear information about when [the] free calls are available and how many free calls they have."  *Id.* at ¶ 26.  ICE personnel have acknowledged that its wall posters alerting detained individuals to the ten-minute free calls may be ineffectual if detained individuals cannot read or understand them.  *See* Cedillo Decl. at ¶ 8.

minute calls, the legal call suffers from frequent interruptions from warning messages that the allotted ten minutes will soon conclude and from automatic disconnection every ten minutes. *See* Brooks Decl. at ¶¶ 3c, 8a.  Attorneys have reported that such fragmented phone calls create difficulties in maintaining a conversation, cause confusion, and hamper the development of legal claims.  *See* Brooks Decl. at 8a (noting that the disjointed ten-minute calls prevented a legal representative from asking the client the "full range of questions that would have strengthened his declaration," ultimately contributing to a negative finding against him); Maynard Decl. at ¶ 3a (noting that it is "extremely difficult, if not impossible, to effectively conduct an intake that is continuously interrupted").

Plaintiffs are also forced to choose between using the free ten-minute calls, if available, to contact their counsel or contact their families.  *See* Cerneka Decl. at ¶ 3 ("While clients can place a ten-minute free call, if they use that call to contact their attorney then they cannot use it [] to maintain contact with their family or anyone else."); Brooks Decl. at ¶ 3c (noting that if clients choose to use their allotted ten-minute calls to contact counsel, they cannot "contact family or anyone else in the outside world").  Such a choice is contrary to Defendants' public statements about the need for free calls "to maintain mental health and connection with others while isolated."  ICE Pandemic Response at p. 23.

### 5.    When Defendants Fail to Facilitate Legal Calls, Calls Are Monitored and Lack Privacy.

Whether detained individuals use one of their allotted free ten-minute calls or pay for calls, those calls are generally on recorded lines and therefore break the attorney-client privilege. Marjon Decl. at ¶ 4; Cerneka Decl. at ¶ 3; Brooks Decl. at ¶ 7; Cedillo Decl. at ¶ 11.  As a result, Plaintiffs have been forced to engage in legal calls without confidentiality in order to prepare their claims or defenses.  *See* Marjon Decl. at ¶ 4 (explaining that he was forced to speak to

clients and potential clients about representation in a lawsuit against ICE on recorded calls); Brooks Decl. at ¶ 7 (describing Cuban asylum seeker detained in Otero who could make just one ten-minute non-confidential call to his counsel in preparation for a request for reconsideration to the Asylum Office of a negative credible fear finding); Cerneka Decl. at ¶ 5 (explaining that despite his attorney's four separate requests to ICE to arrange for free, confidential calls, a Mexican asylum seeker was forced to conduct all calls to prepare for a request for voluntary departure on a recorded line).[6]

In addition, Plaintiffs are often forced to make calls within earshot of other detained individuals and therefore without any privacy. *See* Marjon Decl. at ¶ 5 ("My clients and potential clients had to make these calls from the dormitory and other people were often within earshot."); Brooks Decl. at ¶ 8i ("All of the calls with [our] client came from a phone in the barracks. Our client did not have privacy and our intern could hear detainees around him."). The lack of privacy, combined with an automated statement that the call may be recorded, may impact frank conversations, especially concerning sensitive matters such as past persecution or health conditions. *See* Marjon Decl. ¶¶ 5-6 (explaining that it was "incredibly difficult" to develop an attorney-client relationship and gather sensitive medical information on non-confidential calls where "other people were often within earshot"). One person detained at Otero failed to find legal representation because "he could not speak to [legal service providers] the way he wanted to on the phone. He wanted to converse privately and [was] embarrassed to have to talk in front of others in public about his situation." Vega Decl. at ¶ 45; *see id.* at ¶ 41 (describing a call from a woman who said that her brother, who was detained at Otero, did not

---

[6] On an individual basis, ICE has agreed to add a few legal service provider numbers to an attorney list maintained by Talton that should allow for unmonitored (though not free) calls. *See* Cedillo Decl. at ¶ 12. ICE has not offered to make this procedure available to all attorneys, legal representatives, and volunteers who must access clients and potential clients at Otero.

want to communicate using the available tablets because "[h]e understood that tablet conversations were recorded").

### 6.  Defendants Fail to Provide Reliable, Quality Phone and Tablet Service at Otero.

In addition to refusing to facilitate free, confidential, and private legal calls, Defendants have failed to ensure that the phones and tablets at Otero remain operational, that calls are of adequate quality so that the speakers can be understood, that calls do not drop, and that individuals in solitary confinement are able to make any calls at all.  *See* Vega Decl. at ¶¶ 6-16, 18-25, 30-34.  Between April and June 2020, Margaret Brown Vega, coordinator for Advocate Visitors with Immigrants in Detention ("AVID"), recorded numerous reports of non-functioning phones and tablets.  *Id.* at ¶¶ 6-16.  For a two-week period, from June 10 to June 24, there was no reliable phone or tablet service at Otero.  *Id.* at ¶¶ 11-16.  Phone calls drop suddenly, and the quality of the calls is sometimes so poor that the caller cannot be understood.  *Id.* at ¶¶ 18-25.

## III.  LEGAL STANDARD

In the Tenth Circuit, courts analyze requests for preliminary injunctions under a four-factor standard:  (1) whether there is a substantial likelihood of success on the merits of the case; (2) whether there will be irreparable injury to the movant if the preliminary injunction is denied; (3) whether the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) whether the injunction is not adverse to the public interest.  *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016).  A movant must present a *prima facie* case but need not show a certainty of winning.  *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1252 (10th Cir. 2016).  While the movant bears the burden of demonstrating all four prongs' satisfaction, the four factors are weighed together, and a strong showing for one factor can balance a weaker showing on another factor.  *Logan v. Pub.*

*Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1026, 1033 (D.N.M. 2016) (citing 11A Wright & Miller § 2948.3).

## IV.   ARGUMENT

### A.   Plaintiffs have a Substantial Likelihood of Succeeding on the Merits of their Claims.

Defendants' practices impermissibly restrict Plaintiffs' right to representation of counsel, right to full and fair hearings, and right to petition the government.  Ample case law involving the same claims or analogous claims have been resolved in favor of plaintiffs.[7]  *See, e.g.*, *Torres v. DHS*, Case No. 18-2604, 2020 WL 3124216 (C.D. Cal. April 11, 2020) (granting temporary restraining order, ordering ICE to grant free, confidential legal calls to detained individuals, finding that ICE's policies violated the Fifth Amendment); *S. Poverty Law Ctr. v. DHS*, No. CV 18-760 (CKK), 2020 WL 3265533, at *33-35 (D.D.C. June 17, 2020) (ordering ICE to lift restrictive telephone access policies and grant detained individuals meaningful telephone access).

### 1.   Plaintiffs have a Substantial Likelihood of Succeeding on their Fifth Amendment Due Process and Access to Counsel Statutory Claims.

#### a.   Defendants' Restrictive Telephone Access Practices Have Violated Plaintiffs' Fifth Amendment Rights.

Defendants have denied Plaintiffs their constitutional, statutory, and regulatory rights by unreasonably restricting their telephonic access to the outside world—before and during a global pandemic.  Denying these rights interferes with the attorney-client relationship protected under the Fifth Amendment.  A successful Fifth Amendment Due Process claim requires a showing of

---

[7] The District of New Mexico has found that, in addition to establishing a prima facie case, citation of prior case law on the same issue, resolved in petitioner's favor, is sufficient to show a substantial likelihood of success on the merits.  *See Woods v. Bd. of Cnty. Comm'rs*, No. 1:20-cv-00529-PJK-LF, 2020 U.S. Dist. LEXIS 126526, at *18 (D.N.M. July 17, 2020) (finding that petitioner established that she was substantially likely to prevail on the merits of her due process claim where she cited two cases addressing the same issue and ruling in plaintiff's favor).

a protected interest and the denial of an appropriate level of process. *See Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998). A non-citizen "subject to removal is entitled to procedural due process under the Fifth Amendment." *United States v. Cias*, No. CR 10-0420 JP, 2010 WL 11530513, at *8 (D.N.M. July 29, 2010), *aff'd sub nom. United States v. Varela-Cias*, 425 F. App'x 756 (10th Cir. 2011). *See also Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles [non-citizens] to due process of law in deportation proceedings."); *Diallo v. Gonzales*, 447 F.3d 1274, 1280 (10th Cir. 2006) ("The Fifth Amendment entitles aliens to due process of law in removal proceedings.").

A detained individual's due process rights include meaningful access to counsel, a full and fair hearing, and gathering and presenting evidence. *See Ardestani v. INS*, 502 U.S. 129, 138 (1991) ("We are mindful that the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important."); *United States v. Aguirre-Tello*, 353 F.3d 1199, 1204 (10th Cir. 2004) ("We have stated that when facing deportation aliens are entitled to procedural due process, which provides an opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotations omitted)). By making telephone calls impossible in some cases and expensive, short, unreliable, and highly burdensome to set up in others, ICE interferes with meaningful access to counsel and severely hinders the right to present a full and fair hearing. *See, e.g.*, *Osborn v. Shillinger*, 932 F.2d 975 (10th Cir. 1991) ("When a party to a judicial hearing is not allowed to supply to her or his attorney evidence that would further that party's interests at the hearing, that party's access can not, as a matter of law, be characterized as adequate, effective, and meaningful."); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989) ("[P]ractices that unjustifiably obstruct the availability of professional

representation or other aspects of the right of access to the courts [to detained individuals] are invalid.").

### b. Defendants' Restrictive Telephone Access Practices Have Violated Plaintiffs' Statutory Rights.

The immigration laws and regulations include a panoply of rights to representation of counsel, including, (1) a statutory right to representation of counsel at no expense to the government under the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1362; 1229a(b)(4)(A); (2) a statutory right to representation of counsel at no expense to the government under the Administrative Procedure Act (APA), 5 U.S.C. § 555(b); (3) a regulatory right to representation by an attorney of choice at no expense to the government under the regulations of the Executive Office for Immigration Review, 8 C.F.R. § 1003.16(b) and 8 C.F.R. § 1292.5(b); (4) a statutory right to gather and present evidence in connection with removal proceedings under the INA, 8 U.S.C. § 1229a(b)(4)(B); and, for some non-citizens, (5) a statutory right to a full and fair custody redetermination hearing, 8 U.S.C. § 1226(a). Defendants' restrictive phone access practices violate these statutory and regulatory rights as well.

### c. Case Law Makes Clear that Plaintiffs have a Substantial Likelihood of Success on the Merits.

Courts have found constitutional and statutory violations at other immigration detention facilities based on claims just like those brought here. In response, courts have routinely held that restrictive telephone access practices are illegal and have ordered Defendants to provide free, confidential telephone access to detained individuals. The success of telephone access litigation in courts across the country emphasizes the substantial likelihood of Plaintiffs' success on the merits.

In *Torres v. DHS*, petitioner sought a temporary restraining order arising from restrictive telephone access that prevented effective attorney-client communications with detained

individuals at immigration detention facilities in California.  2020 WL 3124216.  The court

entered the temporary restraining order, finding that plaintiffs were likely to succeed on the

merits of their claims because defendants "likely interfered with established, ongoing attorney-

client relationships" as a result of policies and practices that mirror those in Otero, including (a)

no way for legal professionals to call detained individuals; (b) detention staff not reliably

relaying messages to detained individuals; (c) limited phones that do no function properly; (d)

non-confidential and monitored calls; (e) poor connections and distorting background noise; and

(f) expensive calls that cut off for insufficient funds.  *Id.* at *7-9; *see also Torres v. DHS*, 411 F.

Supp. 3d 1036, 1063–64 (C.D. Cal.) (finding plaintiffs stated a claim for violation of their Fifth

Amendment right to access counsel based in large part on restrictive telephone access).

Accordingly, the court mandated that defendants enable the scheduling of <u>free, confidential</u>

<u>telephone calls</u> within 24 hours of the request.  *Torres*, 2020 WL 3124216 at *11.

       Likewise, in *Southern Poverty Law Center v. DHS*, plaintiff, a non-profit legal service

provider, filed for a temporary restraining order seeking telephonic and video access to counsel

for detained individuals in four ICE facilities.  2020 WL 3265533.  In evaluating whether

Plaintiffs' conditions-of-confinement claims should survive dismissal, the court found that

"Plaintiff has demonstrated a likelihood of success on the merits that the current conditions and

restrictions on remote legal visits and communications through VTCs [video teleconferencing],

legal calls, and document exchanges, taken together, are excessive . . . as COVID-19 makes in-

person legal visitation no longer viable or safe."  *Id.* at *29.  The court ordered much of the relief

sought here, including that defendants shall:

- "comply with the optimal requirements in PBNDS 5.6, Telephone Access";
- "ensure that [defendants'] telephones, VTC systems, and other technology used to access legal representatives (e.g., tablets) are in proper working order";

- "ensure that attorney-client confidentiality can be maintained on all telephone calls and VTCs with attorneys and legal staff."  This included that the calls "not be monitored and should not take place in an area where staff or other detained individuals can overhear attorney-client conversations.";
- "devise and implement clear internal and external procedures, in writing, for scheduling and accessing telephone calls and VTCs," and calls must "be put on the schedule within 48 hours of the request."

*See id.* at *34.

Moreover, other courts across the country—well before COVID-19 rendered in-person visitation impracticable—have recognized a detained individual's critical need for telephone access in the exercise of his constitutional rights.  *See Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1162 (D. Or. 2018) (granting TRO on Fifth Amendment due process claim, requiring detention facility to, inter alia, expand access to remote legal communications and requiring those communications to be confidential, stating, "Government practices that effectively deny access to counsel include the detention of aliens far from where potential or existing counsel was located, limited attorney visitation hours, and the processing of aliens at locations where telephones were not available to them."); *Rodriguez-Castillo v. Nielsen*, No. 5:18-CV-01317-ODW-MAA, 2018 WL 6131172 (C.D. Cal. June 21, 2018) (granting TRO enjoining DHS from limiting phone calls and in-person visits to detained immigrants housed at a medium security prison); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1511 (C.D. Cal. 1988), *aff'd sub nom. Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990) (in evaluating plaintiffs' statutory and due process claims, finding that "Defendants have violated detained plaintiff class members' rights to effective representation of counsel by unduly restricting attorney and paralegal visitation, failing to provide private telephone and visitation facilities, and in some cases failing to provide adequate telephone access."); *See c.f., Johnson ex*

*rel. Johnson v. Brelje*, 701 F.2d 1201, 1207 (7th Cir. 1983) (finding two ten-minute calls a week to criminal defendants detained was unreasonable barrier to access courts).

**2.      Plaintiffs have a Substantial Likelihood of Succeeding on their First Amendment Claims.**

The First Amendment protects Plaintiffs' right to petition the government and to speak with those who may help them prepare for their cases by telephone, including legal professionals and family members.  *See Torres*, 411 F. Supp. 3d at 1067–68 (finding that immigration detention plaintiffs successfully stated a claim under their First Amendment right to communicate with the outside world by alleging, inter alia, widespread restrictions to telephone access); *Gutierrez-Soto v. Sessions,* 317 F. Supp. 3d 917, 932, n.35 (W.D. Tex. 2018) ("The Supreme Court has held that aliens residing in the country are entitled to the protections of the First Amendment.") (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)); *Strandberg v. City of Helena,* 791 F.2d 744, 747 (9th Cir. 1986) ("Courts have recognized detainees' and prisoners' first amendment right to telephone access."); *Daniels v. Morris Cnty. Corr. Facility*, No. CIV.A. 06-2460(DMC), 2006 WL 2524177, at *5 (D.N.J. Aug. 30, 2006) ("Inmates must be afforded reasonable access to telephones so as not to infringe the First Amendment"); *Moore v. Janing*, 427 F. Supp. 567, 576 (D. Neb. 1976) ("It is clear that the plaintiffs have a constitutional right secured by the First Amendment to communicate with persons from outside the prison by means of mail, visits and telephone calls."); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547-48 (2001) (restrictions that "prohibit [attorney] advice or argumentation" in a way that "confine[s] litigants and their attorneys" violate First Amendment).

As one court reasoned,

> Ofttimes use of a telephone is essential for a pretrial detainee to contact a lawyer, bail bondsman or other person in order to prepare his case or otherwise exercise his rights. There are instances where the family of a detainee or inmate may live so far away from [the detention facility] as to make personal visitation impractical. The

18

1
2

> better view appears to be that there is no legitimate governmental
> purpose to be attained by not allowing reasonable access to the
> telephone, and that such use is protected by the First Amendment.

3   *Johnson v. Galli*, 596 F. Supp. 135, 138 (D. Nev. 1984).  This reasoning resonates now, during a

4   global pandemic, when even Defendants discourage in-person visitation and favor the use of

5   telephones for communication.  *See* ICE Guidance on COVID-19.

6

7   **B.   Defendants' Failure to Provide for Telephone Access Irreparably Harms Plaintiffs and Putative Class Members.**

8   ICE's failure to provide for reliable telephone access irreparably harms Plaintiffs by

9

10  denying them their statutory and constitutional rights to access counsel and redress their claims.

11  *See McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250, 1258 (D.N.M. 2003); *S. Poverty*

12  *Law Ctr.*, 2020 WL 3265533, at *32 ("[S]ubstantially restricted access to counsel . . . can cause

13  irreparable injuries related to the proceedings for which Plaintiff's clients are preparing.").  Lack

14  of telephone access interferes with Plaintiffs' ability to present their immigration cases resulting

15  in deportation, and it interferes with their ability to assert their civil rights, a paramount concern

16  for individuals in congregate settings during the COVID-19 pandemic.  *See Torres*, 2020 WL

17  3124216, at *8 ("[W]ithout access to counsel, they are likely to face denial of asylum and

18  ultimately to be deported, despite meritorious claims.").

19

20  "Irreparable harm" means that "the injury 'must be both certain and great' and that it

21  must not be 'merely serious or substantial.'"  *Prairie Band of Potawatomi Indians v. Pierce*, 253

22  F.3d 1234, 1250 (10th Cir. 2001) (quoting *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d

23  Cir.1976)).  "When an alleged constitutional right is involved, most courts hold that no further

24  showing of irreparable injury is necessary."  *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir.

25  2001) (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice

26  and Procedure § 2948.1 (2d ed.1995)).  In *McClendon v. City of Albuquerque*, the District of

27

New Mexico found irreparable harm where county jail officials denied access to attorneys and limited inmates' phone calls to five minutes.  272 F. Supp. 2d at 1258.  The court reasoned that because plaintiffs' claims had "constitutional underpinnings"—the First Amendment right to access counsel—plaintiffs "need not make any further showing of irreparable injury." *Id.* at l259.  Similarly, Plaintiffs here contend that Otero's restrictions—calls that drop after a short time; burdensome, confusing procedures to set up a free legal call; lack of privacy and confidentiality—interfere with their First Amendment right of redress and Fifth Amendment right to due process.  While a further showing of irreparable harm need not be shown, *McClendon*, 272 F. Supp. 2d at 1258, Plaintiffs can show multiple instances of irreparable harm.

ICE's failure to provide individuals detained in Otero with free legal calls undermines their ability to obtain or consult an attorney, interfering with the statutory and constitutional right to counsel of their choosing and the right to present their case.  Without free legal calls, detained individuals are charged about 20 cents per minute for non-confidential calls.  Cedillo Decl. at ¶ 11.  To put this in perspective, a 30-minute intake call would cost a detained individual $6, and a 2-hour legal call preparing a declaration for an immigration court filing would cost $24. At best, detained individuals with limited funds must make the choice between contacting their attorney with their free ten-minute call or calling family members or others in the outside world.  Cerneka Decl. at ¶ 3.  At worst, the lack of telephone access results in the government deporting individuals—often returning to a country riddled with persecution and torture—without even completing a legal intake with an attorney.  *See Innovation Law Lab*, 310 F. Supp. 3d at 1163 (finding irreparable harm where "[t]he denial of access to legal assistance is likely to lead to the denial of asylum and ultimately to the deportation of detainees with meritorious asylum claims"); *Torres*, 2020 WL 3124216, at *8 (same).  Between May and July 2020, at least three individuals

at Otero were removed before they were able to participate in legal intakes, despite Herculean efforts by lawyers to arrange the calls through ICE.  *See* Cedillo Decl. at ¶¶ 14-17; Brooks Decl. at ¶ 8.  An individual from El Salvador was removed after Santa Fe Dreamers staff made numerous requests for a phone calls at the end of May and beginning of June.  Cedillo Decl. at ¶ 16. Another individual from Guatemala ran out of money before he could compete his legal intake on June 16, 2020.  *Id.* at ¶ 14.  He was removed at the end of that month.  *Id.*  Similarly, Las Americas attorney Max Brooks represented a client in July 2020, for whom he had difficulty reaching by phone to prepare a declaration, resulting in a sub-par declaration. Brooks Decl. at ¶ 8.  The problems with phone access, and the resulting sub-par declaration "may have contributed to our lack of success before the IJ and with the RFR."  Id. at ¶ 8(j).

For others at Otero, the lack of telephone access has prolonged their time in detention. *See Ramirez v. ICE*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018) ("[D]eprivations of physical liberty are the sort of actual and imminent injuries that constitute irreparable harm."). For one Cuban migrant at Otero, ICE ignored four separate attempts to set up a legal intake in May 2020. Cedillo Decl. at ¶ 15.  Forced to communicate with him by postal mail and through only two ten-minute calls, Santa Fe Dreamers successfully advocated for his release in July 2020.  *Id.* Without the telephone access issues that delayed his intake, he could have been released much sooner.  *Id.*  Plaintiff Ruben Torres Jauregui was unable to prepare for his removal proceedings because he was not able to call his attorney, nor was his attorney able to set up a free legal call through ICE.  Cerneka Decl. at ¶ 4.  He was ordered removed.

Clients in expedited removal proceedings are particularly susceptible to irreparable harm because those proceedings typically last only "days or weeks."  Brooks Decl. at ¶ 4.  Attorney Brooks has struggled to represent expedited removal clients due to ICE's refusal to promptly

arrange legal calls and to schedule calls of a sufficient duration to prepare for legal proceedings. *Id.* This is particularly troubling because many have complex asylum claims. *See Innovation Law Lab*, 310 F. Supp. 3d at 1163 ("Early representation is particularly important in asylum claims, given the complexity of treaty-based human rights statutes and the serious harm—including persecution, torture, and death—that may result if asylum is improperly denied.").

Further, Plaintiffs face the continual, irreparable harm of calls that are neither confidential nor private, interfering with the attorney-client relationship. A supervisory ICE deportation officer confirmed to Attorney Cedillo that, "At this time due to COVID-19 restrictions within the facility detainees are only allowed to use the phone in the dormitory for legal purposes." Cedillo Decl. at ¶ 18. Attorney Cerneka placed four requests with ICE to set up a free, confidential legal call with her client. Cerneka Decl. at ¶ 5. ICE never responded. *Id.* Instead, her client had to call her on a recorded line in a non-private setting in the cells, using his own funds. *Id.* ("I worried throughout my representation because our calls were recorded."). Attorney Joachim Marjon sought to represent medically vulnerable individuals at Otero for the purpose of a COVID-19-related habeas petition. Marjon Decl. at ¶ 2. Mr. Marjon struggled to develop a trusting attorney-client relationship when he interviewed potential clients about their medical history due to the lack of privacy. *Id.* at ¶¶ 5-6. Again, his clients and prospective clients had to call him with their own funds on a public, recorded line. *Id.* at ¶ 4.

The harm to those detained at Otero is heightened dramatically by COVID-19, when attorneys and legal representatives are restricted from in-person visits, and when the need for contact with the outside world has never been greater. *See S. Poverty Law Ctr.*, 2020 WL 3265533, at *32 ("[Access to counsel] is particularly pressing now, as many of Plaintiff's clients are seeking release from the Facilities based on the emergence of COVID-19; some of those

same clients have medical vulnerabilities that put them at high-risk for severe illness if they contract COVID-19."); *Torres*, 2020 WL 3124216, at \*9 (recognizing "the urgency of access to counsel, and the maintenance of access to courts" in light of COVID-19).  Nevertheless, in April 2020, ICE completely cut off free, confidential legal calls to Attorney Maria Martinez Sanchez and her colleagues at the ACLU of New Mexico, who were investigating civil rights and habeas claims for detainees at Otero.  Martinez Sanchez Decl. at ¶ 10.  When Ms. Martinez Sanchez complained to ICE that the current process for setting up legal calls was not working, ICE told her that it would "no longer set up calls" and that Talton was "already providing short free calls for detainees on a limited basis."  *See id.*, Ex. B.  To date, the ACLU has continued to have problems making free, confidential phone calls that last more than three to five minutes.  *Id.* at ¶¶ 11-13.

Detained individuals are also harmed by their inability to access their rights under the *Fraihat v. ICE* litigation.  *See* No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020).  There, the Central District of California issued a preliminary injunction covering a class of detained individuals with COVID-19 risk factors, finding "punitive conditions of confinement, in violation of the Fifth Amendment."  *Id.* at \*21, 25.  Two detained individuals at Otero tried to call a toll-free number to assess and assert their rights under the class action. Neither individual was able to place the call because the number would automatically disconnect. Vega Decl. at ¶¶ 46-47.

In sum, the COVID-19 pandemic has made the need for free, confidential telephone access all the more critical and urgent.  The lack of access to telephones is irreparably harming detained individuals at Otero by interfering with their chances to find an attorney and their ability to communicate with their attorney if they are lucky enough to secure one.  The lack of

privacy and confidentiality interferes with the attorney-client relationship and affects a detained individual's ability to speak frankly with his or her attorney, especially on sensitive matters such as past persecution or medical issues.  ICE's complete dereliction of its obligation to provide telephone access has thus resulted in compromised legal representation at best and prolonged detention and deportation at worst.

### C.    The preliminary injunction would cause no injury to Defendants and would be in the public interest

When the government is the defendant, the third and fourth preliminary injunction factors—the balance of harms and the public interest—merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "The third preliminary-injunction factor involves balancing the irreparable harms identified above against the harm that the preliminary injunction causes [the other party]."  *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019).  "When a constitutional right hangs in the balance, though, 'even a temporary loss' usually trumps any harm to the defendant."  *Id*. (quoting 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.2 & n.10 (3d ed. & Nov. 2018 update)).

Here, any administrative cost to the government "pale[s] in comparison to the deprivation of Plaintiffs' constitutional rights" in the absence of an injunction.  *Jackson v. King*, No. 2:12-CV-00421-MCA-RHS, 2013 WL 12334146, at *8 (D.N.M. Mar. 30, 2013).  The administrative burden is especially low because existing ICE guidance and regulations require that Defendants implement policies more protective of Plaintiffs' rights than those currently in operation at Otero.  *See* DHS & ICE, Performance-Based National Detention Standards 2011 (Dec. 2016) ("2011 PBDNS"); ICE Pandemic Response, p. 19, 23.  An order enforcing Defendants' own access standards require Defendants to enforce what they already have the authority and means to do.  *See* Order Granting TRO, *Torres*, No. 5:18-cv-02604 (C.D. Cal. Apr. 11, 2020), ECF No.

144 ("Although a grant of relief requires Defendants to take steps to ensure access to counsel, any administrative burden will be minor based on the limited scope of that relief, which can mirror policies already envisioned by Defendants' own regulations and guidance.").  Further, in compliance with other preliminary injunctions and settlements, Defendants have already implemented relief similar to that requested by Plaintiffs.  *See id.*; *S. Poverty Law Ctr.*, 2020 WL 3265533; *see also* Stipulated Settlement, *Lyon v. ICE*, No. 13-cv-05878-EMC (N.D. Cal. Oct. 31, 2016), ECF No. 280-1 (settling ICE telephone access case).

Furthermore, an injunction would be in the public interest.  *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012).  "[I]t's always in the public interest to prevent the violation of a party's constitutional rights."  *Free the Nipple-Fort Collins*, 916 F.3d at 807.  *See also Upshaw v. Alameda Cnty.*, 377 F. Supp. 3d 1027, 1033 (N.D. Cal. 2019) (finding public interest in enjoining punitive conditions of confinement in violation of due process); *Doe v. McAleenan*, 415 F. Supp. 3d 971, 979 (S.D. Cal. 2019) ("[T]he public interest is served by allowing Petitioners' access to retained counsel prior to and during their non-refoulement interviews.").

It is also always in the public interest for the government to comply with its own publicly stated policies.  *See* 2011 PBNDS; ICE Pandemic Response at p. 19, 23.  *See also Eight N. Indian Pueblos Council, Inc. v. Kempthorne*, No. CV 06-745 WJ/ACT, 2006 WL 8443876, at *5 (D.N.M. Sept. 15, 2006) ("It is in the public interest that federal agencies comply with their own policies and with federal statutes."); *Medina v. DHS*, 313 F. Supp. 3d 1237, 1252 (W.D. Wash. 2018) ("[P]ublic interest exists in ensuring that the government complies with its obligations under the law and follows its own procedures."); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C.1998) (holding that "the public has a general interest in the meticulous compliance with the law by public officials.").  As such, because Plaintiffs seek Defendants' compliance with the

Constitution, the Immigration and Nationality Act, and Defendants' publicly stated policies, the public interest favors granting an injunction.

## V.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court grant class-wide preliminary injunctive relief.

Respectfully Submitted,

Dated:  August 26, 2020              ORRICK, HERRINGTON, & SUTCLIFFE LLP

/s/ R. David Hosp

R. David Hosp
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley St. Ste 2000
Boston, MA  02116
Telephone: (617) 880-1886
Facsimile: (617) 880-1801
Email: dhosp@orrick.com

René A. Kathawala
Paige Pavone
Lauren D. Allen
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
Telephone: (212) 506-3604
Facsimile: (212) 506-5151
Email: ppavone@orrick.com

Katherine Melloy Goettel (*Pro Hac Vice* Admission
Pending)
AMERICAN IMMIGRATION COUNCIL
1331 G Street, NW, Suite 200
Washington, DC 20005
Tel.:  (202) 507-7552
Email: kgoettel@immcouncil.org

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 26, 2020, a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM IN SUPPORT OF A PRELIMINARY INJUNCTION was served with the Clerk of the Court by using the CM/ECF system, which provided an electronic notice and electronic link of the same to all attorneys of record through the Court's CM/ECF system.

Dated:  August 26, 2020          By:     <u>/s/ Paige Pavone</u>